UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHARON WEISEL, | : |
| | :CIVIL ACTION NO. 3:13-CV-3003 |
| Plaintiff, | : |
| | :(JUDGE CONABOY) |
| v. | : |
| | : |
| STERICYCLE COMMUNICATIONS | : |
| SOLUTIONS t/a Stericycle | : |
| and/or Notify MD, | : |
| | : |
| Defendant. | : |
| | : |

_____

**MEMORANDUM**

Here we consider Defendant's Motion for Summary Judgment (Doc. 21) filed on October 29, 2014, and accompanied by Defendant's Statement of Undisputed Material Facts (Doc. 22).  With this motion, Defendant seeks summary judgment in its favor on Plaintiff's disability discrimination claim which is based on her allegation that Defendant's perception that she was disabled resulted in the loss of her employment (Doc. 1 ¶ 42).  Defendant filed Defendant's Brief in Support of Motion for Summary Judgment (Doc. 24) on November 12, 2014.  On December 17, 2014, Plaintiff filed her answer to Defendant's Statement of Material Facts and Plaintiff's Counter-Statement of Facts (Doc. 30) and Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. 31).  With the filing of Defendant's reply brief (Doc. 35) on January 12, 2015, this motion became ripe for disposition.  For the reasons discussed below, we conclude Defendant's motion is properly granted.

## I. Background

Defendant Stericycle, Inc., ("Defendant" "Stericycle") operates a call center business in Dunmore, Pennsylvania.[1]  (Doc. 22 ¶ 1; Doc. 30 ¶ 1.)  Defendant hired Plaintiff Sharon Weisel ("Plaintiff") in October 2012 as a part-time call center operator at the Dunmore facility.  (Doc. 22 ¶ 2; Doc. 30 ¶ 2.)

When she was hired, Plaintiff received Defendant's Handbook and a Code of Conduct and acknowledged that she read both.  (Doc. 22 ¶¶ 3, 4; Doc. 30 ¶¶ 3, 4.)  The Handbook contained a Concern Resolution Policy which set out three steps by which an employee could resolve issues: the employee should have an open discussion about her concern with her supervisor, she should then go to her manager, and finally to Human Resources.  (Doc. 22 ¶ 10; Doc. 30 ¶ 10.)  Plaintiff testified that she understood the policy.  (Doc. 22 ¶ 11; Doc. 30 ¶ 11.)

The Code of Business Conduct contained a Communication Channels Policy that provided multiple ways an employee could report possibly unlawful or unethical situations, including calling the Team Member Help Line, contacting a manager, or contacting a member of senior management.  (Doc. 22 ¶ 12; Doc. 30 ¶ 12.)

Under Defendant's attendance policy, employees could be required to provide a doctor's note upon return from absence.

---

[1]  Defendant states that Plaintiff incorrectly identified the company as Stericycle Communications Solutions t/a Stericycle and/or Notify MD.  (Doc. 22 at 1.)

(Doc. 22 ¶ 17; Doc. 30 ¶ 17.)  Plaintiff knew she could be asked to do so.  (*Id.*)

Plaintiff worked the day-shift and was supervised by call center supervisor, Jennifer Walsh.  (Doc. 22 ¶ 20; Doc. 30 ¶ 20.) Christopher Ulrich was the other center supervisor who generally worked nights.  (Doc. 22 ¶ 21; Doc. 30 ¶ 21.)  At the relevant time, Walsh and Ulrich were the only two supervisors at the Dunmore facility.  (Doc. 22 ¶ 22; Doc. 30 ¶ 22.)

Matthew Spott performed Human Resources functions out of the Dunmore facility, but Defendant's Human Resources Department was otherwise located at its corporate offices in Northbrook, Illinois. (Doc. 22 ¶ 24; Doc. 30 ¶ 24.)  Spott reported to Dawn Johnson, Human Resources Manager, and Lisa Torrez, Human Resources Director. (Doc. 22 ¶ 25; Doc. 30 ¶ 25.)

Plaintiff took time off from work for gallbladder surgery and recovery in February and March of 2013.  (Doc. 22 ¶ 26; Doc. 30 ¶ 26.)  Plaintiff adds that she never disclosed her exact medical condition to Defendant; the information was obtained in the course of this litigation.  (Doc. 30 ¶ 26.)  On February 6, 2013, Plaintiff submitted a doctor's note about her upcoming surgery to Defendant.  (Doc. 22 ¶ 27; Doc. 30 ¶ 27.)  Plaintiff's supervisor, Jennifer Walsh, received the note, and initialed and dated it as was her standard practice.  (Doc. 22 ¶ 28; Doc. 30 ¶ 28.)  The note stated that Plaintiff's surgery was scheduled for February 22,

2013.  (Doc. 22 ¶ 29; Doc. 30 ¶ 29.)  The note did not indicate how long Plaintiff would be off work.  (*Id.*)  Walsh approved Plaintiff to be off work for her surgery.  (Doc. 22 ¶ 30; Doc. 30 ¶ 30.) Plaintiff's surgery took place on February 22, 2013.  (Doc. 22 ¶ 32; Doc. 30 ¶ 32.)

On approximately March 2, 2013, Plaintiff called Walsh about coming back to work and told Walsh the date of her follow-up appointment with her doctor.  (Doc. 30 ¶ 162.)  Walsh told Plaintiff to wait the two weeks she had been given for time off. (*Id.*)

On March 6, 2013, Plaintiff went to her doctor for a follow-up appointment and obtained a return to work note.  (Doc. 22 ¶ 34; Doc. 30 ¶ 34.)  The note stated: "Sharon Weisel is currently under my surgical care.  She may return to work on 03/11/2013.  Activity is restricted as follows: none."  (Doc. 22 ¶ 35; Doc. 30 ¶ 35.)

The same day Plaintiff called into the Dunmore facility and spoke with her niece, Jacqueline Minutes, who also worked at Defendant's Dunmore location.  (Doc. 22 ¶ 36; Doc. 30 ¶ 36.) Plaintiff adds that Minutes was authorized to accept such calls. (Doc. 30 ¶ 36.)  Minutes was a Team Lead.  (Doc. 22 ¶ 37; Doc. 30 ¶ 37.)  Defendant avers she was not a supervisor; Plaintiff avers her duties as a Team Lead included supervisory roles.  (*Id.*)  Plaintiff testified that she considered Minutes a supervisor.  (Doc. 30 ¶ 163.)  Because of the familial relationship, Plaintiff always

4

reported to a different Team Lead.  (Doc. 22 ¶ 38; Doc. 30 ¶ 38.)
Minutes did not handle employee requests for time off for medical
reasons, nor did she handle employees returning to work from
medical leave.  (Doc. 22 ¶ 39; Doc. 30 ¶ 39.)   Plaintiff adds that
she denies that Minutes did not have the authority to accept and
submit a medical note from an employee to her supervisor, Jennifer
Walsh or Christopher Ulrich.  (Doc. 30 ¶ 39.)

     During the call, Plaintiff informed Minutes that Plaintiff's
doctor had released her to return to work on March 11, 2013,
without restrictions.  (Doc. 22 ¶ 40; Doc. 30 ¶ 40.)   Minutes
reminded Plaintiff to submit a doctor's note.  (Doc. 22 ¶ 41; Doc.
30 ¶ 41.)   Plaintiff adds that Minutes did not bring up the
doctor's note; Plaintiff specifically informed Minutes that
Plaintiff needed to fax over a medical excuse.  (Doc. 30 ¶ 41.)
During the call, Plaintiff did not ask to speak to Walsh, her
supervisor, or Spott in Human Resources.  (Doc. 22 ¶ 42; Doc. 30 ¶
42.)   Plaintiff adds that there was no reason to do so.  (Doc. 30 ¶
42.)   Plaintiff also testified that Minutes informed her that she
would let Walsh know about her release to return to work.  (Doc. 30
¶ 163.)

     Plaintiff testified that she faxed Defendant the March 6,
2013, doctors note on March 6th.  (Doc. 22 ¶ 43; Doc. 30 ¶ 43.)
Minutes recalls seeing the note come through the facility's
corporate e-fax software.  (Doc. 22 ¶ 44; Doc. 30 ¶ 44.)   Defendant

avers that Minutes testified she could not recall what she did with the note next--she either printed the note to give it to Walsh or she sent it by email to Walsh (Doc. 22 ¶ 45); Plaintiff avers that Minutes testified she immediately forwarded Plaintiff's fax to her supervisor, Jennifer Walsh (Doc. 30 ¶ 45).  Minutes testified that she did not know if Walsh actually received and read Plaintiff's March 6, 2013, return to work note.  (Doc. 22 ¶ 46; Doc. 30 ¶ 46.) Plaintiff also testified that she had no personal knowledge as to whether Walsh, Ulrich, or Spott actually received or read her return to work note.  (Doc. 22 ¶ 47; Doc. 30 ¶ 47.)  Plaintiff adds that the actions of Walsh, Ulrich, and Spott requesting additional information coincided exactly with the submission of the note. (Doc. 30 ¶ 47.)  Defendant avers that all three testified that they never saw the March 6, 2013, note (Doc. 22 ¶ 48); Plaintiff denies that they did not see the note, asserting that the timing of the request for more information cannot just be coincidence (Doc. 30 ¶ 48).  Defendant avers the note was not initialed or dated by Walsh as received, which was her standard practice upon receiving an employee's doctor note (Doc. 22 ¶ 49); Plaintiff denies this as stated, asserting this is an issue of fact (Doc. 30 ¶ 49).

Defendant asserts that Plaintiff testified she "would have 'no idea' if someone from Stericycle lost her return to work note." (Doc. 22 ¶ 50.)  Plaintiff denies that she would have no idea if someone lost her note.  (Doc. 30 ¶ 50.)  She claims this is an

6

improper averment and Plaintiff guessing whether someone could have lost something is irrelevant to whether Defendant actually received the note in that Minutes admitted that she received the note. (*Id.*)  Regarding Defendant's receipt of the return-to-work note, Plaintiff also points to being told that Defendant was refusing the note she faxed.  (Doc. 30 ¶ 172.)

The next day--March 7, 2013--Plaintiff testified that she spoke with Walsh by telephone, and Walsh informed Plaintiff that Spott needed Plaintiff to provide the exact medical reason for which she was off work.  (Doc. 22 ¶ 52; Doc. 30 ¶ 52.)  Plaintiff also testified that Walsh told her Spott would not accept the medical release without an exact medical reason on it.  (Doc. 30 ¶ 165.)  Plaintiff testified she asked why she needed to provide the information, and Walsh said she did not know--it was up to Human Resources.  (Doc. 22 ¶ 53; Doc. 30 ¶ 53.)  Plaintiff testified that Walsh said Plaintiff needed to provide the information to return to work.  (Doc. 22 ¶ 54; Doc. 30 ¶ 54.)  Defendant avers Plaintiff further testified that she thought this meant she was fired, though she acknowledged that Walsh never told her she was fired and never gave Plaintiff anything in writing stating that she was terminated. (Doc. 22 ¶¶ 55-56); Plaintiff avers she testified that Walsh told her she could not return to work without providing Defendant with additional medical information and Ulrich used the word "fired" (Doc. 30 ¶¶ 55-56).

Walsh testified that the first she knew of the request for the medical reason for Plaintiff's absence was several days later when she was approached by Minutes and asked why Defendant would need to know the medical reason for Plaintiff's absence.  (Doc. 30 ¶ 196.) Walsh testified that in response to Minutes question, she approached Spott.  (*Id.*)

Plaintiff acknowledged that during a separate call with Walsh on March 7, 2013, Walsh provided her with a work schedule for the following week of March 11, 2013.  (Doc. 22 ¶ 57; Doc. 30 ¶ 57.) Plaintiff testified that she asked Walsh, "So I am not fired then?" and Walsh replied that it was up to Human Resources.  (Doc. 22 ¶ 58; Doc. 30 ¶ 58.)

Walsh testified that she spoke with Plaintiff on the phone about returning to work; she denied that Plaintiff told her about faxing the medical release and denied seeing the release.  (Doc. 30 ¶ 198.)

Plaintiff alleges that Walsh left Plaintiff a voicemail on March 7, 2013, instructing Plaintiff to call the other supervisor, Christopher Ulrich.  (Doc. 22 ¶ 59; Doc. 30 ¶ 59.)

Plaintiff spoke with Ulrich on March 7, 2013.  (Doc. 22 ¶ 60; Doc. 30 ¶ 60.)  Ulrich informed Plaintiff that in order for her to return to work, she had to provide the date her issue started, the exact medical reason for her absence, the date she could return to work, and whether she had any restrictions.  (Doc. 22 ¶ 61; Doc. 30

¶ 61.)  Ulrich testified that he asked Plaintiff for an exact medical condition and testified that Walsh asked him to send an email requesting the information.  (Doc. 30 ¶ 214.)  According to Plaintiff, Ulrich told her she had to provide the information the next day or she could not return.  (Doc. 22 ¶ 62; Doc. 30 ¶ 62.) Defendant avers Plaintiff testified that she thought this meant she was fired, though she admitted that Ulrich never told her she was fired and never gave her anything in writing indicating she was terminated (Doc. 22 ¶¶ 63-64); Plaintiff states she testified that Walsh, Ulrich and Spott wanted to know the exact medical reason or she could not return to work, and, although Ulrich never gave her anything in writing saying she was terminated, he led her to believe that she would be terminated if she did not provide the exact medical reason for her absence (Doc.  ¶¶ 63-64).  Defendant avers that Ulrich testified that he never terminated Plaintiff during the call; Plaintiff denies this.  (Doc. 22 ¶ 65; Doc. 30 ¶ 65.)

The next day, Plaintiff called Ulrich and asked him to put the request in an email and Ulrich did so.  (Doc. 22 ¶ 66; Doc. 30 ¶ 66.)  On March 8, 2013, Ulrich sent Plaintiff an email that stated: "Here is the information we would need prior to your return to work.  We need date the issue started, exact medical reason why you were out, exact or estimated date of return to work and any restrictions.  We need specifics."  (Doc. 22 ¶ 67; Doc. 30 ¶ 67.)

Ulrich testified that it was his understanding that Plaintiff had not submitted a return to work note at the time he sent the email. (Doc. 22 ¶ 68; Doc. 30 ¶ 68.)  Plaintiff testified that she did not know why Ulrich was requesting the information.  (Doc. 22 ¶ 69; Doc. 30 ¶ 69.)  Plaintiff testified that she was upset after receiving this email and thereafter she never attempted to contact anyone at Stericycle.[2]  (Doc. 22 ¶¶ 70-71; Doc. 30 ¶¶ 70-71.) Plaintiff never called the Team Member Help Line.  (Doc. 22 ¶ 72; Doc. 30 ¶ 72.)

Plaintiff went to the EEOC on March 10 or 11, 2013.  (Doc. 22 ¶ 73; Doc. 30 ¶ 73.)  She testified that she did so because she believed she had been fired.  (Doc. 30 ¶ 176.)

Walsh testified that she sent Spott an email on March 12, 2013, attaching doctor's notes provided by Plaintiff.  (Doc. 30 ¶ 202.)[3]  In the email, Walsh noted that she understood Plaintiff was

---

[2]  Plaintiff admits "she did not attempt to contact anyone at Stericycle," however, she immediately adds that "it is denied that she didn't attempt to contact anyone as she immediately filed a complaint with the Equal Employment Opportunity Commission (EEOC) to investigate her claim of discrimination.  Further, she did have a conversation with Matthew Spott after the email."  (Doc. 30 ¶ 71.)  The record also shows that Plaintiff sent an email to Spott on March 13, 2013.  (Doc. 22 ¶ 97; Doc. 30 ¶ 97.)

[3]  Plaintiff's citation to the record is inaccurate: she cites Walsh Dep. p. 39 and Exhibit CU#3 to Exhibit #6; Walsh's reference to the March 12th email begins on page 38 of her deposition and that email is CU#5 to Exhibit #6.  Walsh's testimony indicates that she testified she derived the information about Plaintiff's return-to-work date of Monday, March 11, 2013, from a phone conversation with Plaintiff which she believed occurred the previous Thursday when Walsh "reached out to her to make her aware of the return-to-work

to return to work on March 11, 2013.  (*Id.*)

Defendant's employees testified that Defendant generally would not need to ask for an employee's exact medical condition; rather the company would request the dates an employee was out, return to work date, and if the employee has any restrictions.  (Doc. 22 ¶ 74; Doc. 30 ¶ 74.)

Spott testified that he became involved after Ulrich sent the email (March 8, 2013).  (Doc. 22 ¶ 76; Doc. 30 ¶ 76.)  He informed Ulrich that the company did not need to know Plaintiff's exact condition--it only needed the dates an employee was out, return to work date, and if the employee has any restrictions.  (Doc. 22 ¶ 75; Doc. 30 ¶ 75.)

Spott testified that he attempted to reach Plaintiff multiple times after he became involved.  (Doc. 22 ¶ 77; Doc. 30 ¶ 77.)  Spott testified that he did so because he and his supervisor, Lisa Torrez, wanted to let Plaintiff know and clarify that they did not need to know her exact medical diagnosis and that she could return to work upon providing a simple return to work note.  (Doc. 22 ¶ 78.)  Plaintiff denies Spott's testimony:

> To the contrary, Stericycle was admittedly in receipt of the return to work note (Jackie Minutes admitted to the receipt and forwarding to Walsh), and after Ulrich asked for the Plaintiff's exact medical condition,

────────────────

information that we would needed [sic].  I believe I also gave her a schedule at that time as well."  (Doc. 32-4 at 39 (Walsh Dep. 39:6-14).)

> both Torrez and Spott tried to cover up the
> mistake.  By acting as though they never
> received a return to work note, when they
> actually did, they were able to keep asking
> the Pliantiff for a note already submitted.

(Doc. 30 ¶ 78.)  Plaintiff adds "[t]he same confused the Plaintiff,
and lead [sic] her to believe they were being dishonest on top of
asking her for private medical information."  (*Id.*)  Plaintiff also
avers that Spott refused to answer when asked if Plaintiff informed
him that she had submitted a return to work slip with full
clearance; Spott did not recall whether he had asked Ulrich whether
he was in receipt of a doctor's note releasing Plaintiff to return
to work; and it would not have been his responsibility to ask Walsh
or Ulrich whether Plaintiff had submitted a return to work note.
(Doc. 30 ¶¶ 231-33.)

Spott reached Plaintiff by phone on March 10 or 11, 2013.
(Doc. 22 ¶ 80; Doc. 30 ¶ 80.)  Plaintiff testified that she said:
"Matt, I can't talk right now.  I'm on my way to my son's doctor's
appointment.  I'm walking in the office. . . . [B]esides, I don't
know what you want from me.  You know what you did was illegal,
what you're asking is illegal.  And now I filed with the EEOC."
(Doc. 22 ¶ 80; Doc. 30 ¶ 80.)  Spott testified that he did not have
a chance to go into details with Plaintiff during this
conversation.  (Doc. 22 ¶ 83; Doc. 30 ¶ 83.)  Plaintiff testified
that this was her only conversation with Spott and it took place
after she had filed with the EEOC.  (Doc. 22 ¶¶ 81, 82; Doc. 30 ¶¶

12

81-82.)  Plaintiff further testified that she was upset that "only after Spott was told that she filed a complaint with EEOC did he change everything around."  (Doc. 30 ¶ 177.)

Spott sent Plaintiff a follow-up email on March 12, 2013, clarifying that the company did not need to know her medical condition.  (Doc. 22 ¶ 84; Doc. 30 ¶ 84.)  The email stated that Plaintiff did not need to provide the details of her medical condition and requested Plaintiff to provide a doctor's note that identified when Plaintiff became incapable of coming to work, when she could return to work, and if she had any restrictions.  (Doc. 22 ¶¶ 85, 86; Doc. 30 ¶¶ 85, 86.)  The email also stated that Plaintiff needed to call him by 3:00 p.m. the next day.  (Doc. 22 ¶ 87; Doc. 30 ¶ 87.)

Spott testified that it was his understanding that Plaintiff had not yet submitted a return to work note when he sent the email on March 12, 2013 (Doc. 22 ¶ 88; Doc. 30 ¶ 88), though  Plaintiff denies that he did not receive the return to work note (Doc. 30 ¶ 88).  Plaintiff testified that she had no personal knowledge as to why Spott sent the March 12, 2013, email.  (Doc. 22 ¶ 89; Doc. 30 ¶ 89.)  She admitted that she received, read, and understood Spott's email.  (Doc. 22 ¶ 93; Doc. 30 ¶ 93.)  Spott made further attempts to contact Plaintiff through Walsh.  (Doc. 22 ¶¶ 90-92; Doc. 30 ¶¶ 90-92.)  Plaintiff admitted that she did not call Spott after receiving the March 12th emails from Spott and Walsh and a separate

13

telephone message from Walsh, nor did she call Walsh or Ulrich. (Doc. 22 ¶¶ 94, 95; Doc. 30 ¶¶ 94, 95.)

Plaintiff testified that she did not re-fax the doctor's note, deliver it to the Dunmore facility, or resubmit it to anyone. (Doc. 22 ¶ 96; Doc. 30 ¶ 96.)   Plaintiff adds that she did not do so because Defendant already had the note.   (Doc. 30 ¶ 96.)

On March 13, 2013, Plaintiff emailed Spott and stated:

> Am I getting fired twice?  I was told by
> Chris Ulrich that if I did not hand in the
> medical excuse with the demands as stated in
> the email by 3/8/2013 I could not return.  I
> did not hand in the doctor's note with the
> demands as per your request according to Jenn
> Walsh by 3/8/2013 so far as I know I was
> already fired.

(Doc. 22 ¶ 97; Doc. 30 ¶ 97.)  Spott testified that Plaintiff had not been fired at the time of this email (Doc. 22 ¶ 98); Plaintiff denies that she was informed by Spott, Walsh, or Ulrich that she was not fired (Doc. 30 ¶ 98).

Spott responded to Plaintiff's email and stated: "I've cc'd my director, Lisa Torrez on this email.  She wants to personally speak to you.  As a company, we just want to make sure everything is in-order [sic] for your return.  We need to make sure the doctors have released you without restrictions, and that you are safe and able to complete the duties and tasks of the working requirements.  Lisa will be reaching out to you directly over sometime either today or tomorrow."  (Doc. 22 ¶ 99; Doc. 30 ¶ 99.)  Spott testified that he sent the email so that Plaintiff would know she was not being

terminated and he did not know where Plaintiff got the idea she was
fired.  (Doc. 22 ¶¶ 100-01; Doc. 30 ¶¶ 100-01.)  Plaintiff denies
that the testimony is accurate or true.  (Doc. 30 ¶¶ 100-01.)
Defendant avers that Plaintiff admitted that Spott never told her
she was fired.  (Doc. 22 ¶ 102.)  Plaintiff admits she stated that
Spott never fired her, however she denies that she was not fired--
Ulrich used the word "fired"; Walsh specifically told her she could
not return to work and when Plaintiff asked her if she was fired,
Walsh responded that the decision was up to Human Resources.  (Doc.
30 ¶ 102.)

     Plaintiff received a letter from Lisa Torrez dated March 15,
2013, which stated:

> "I have called and left messages for you on
> March 14, 2013 and March 15, 2013 in an
> attempt to discuss your leave.  I have not
> received a return call from you nor has
> Matthew Spott the Human Resources Generalist
> in the Dunmore location.  I was hoping to
> discuss the release to return to work with no
> restrictions from your physician which we
> need for our files in order to be able to
> create your work schedule and return to
> work."

(Doc. 22 ¶ 106; Doc. 30 ¶ 106 (quoting Pl. Compl., Ex. I thereto).)
The letter also asked Plaintiff to provide a return to work note by
Friday, March 22, 2013, and to contact Torrez directly if she could
not meet that deadline.  (Doc. 22 ¶ 108; Doc. 30 ¶ 108.)  Plaintiff
testified that she read and understood the letter.  (Doc. 22 ¶ 110;
Doc. 30 ¶ 110.)  Plaintiff also received a voicemail from Torrez.

(Doc. 22 ¶ 111; Doc. 30 ¶ 111.)   Plaintiff testified that she never returned Torrez' voicemail, never talked to Torrez, never sent Torrez her return to work note, and Torrez never told her she was fired.  (Doc. 22 ¶¶ 112-13; Doc. 30 ¶¶ 112-13.)   Plaintiff further testified that she thought the March 15th letter was an attempt by Defendant to cover up its wrongdoing.  (Doc. 30 ¶ 179.)

Plaintiff also points to a log note authored by Spott which states "Sharon's supervisor actually asked for a medical diagnosis in an email, so now Lisa and myself are working on some damage control, but Sharon is still not cooperating.  She is an extremely difficult person."  (Doc. 30 ¶ 224 (citing CU #8 to Exhibit #6); Doc. 30 ¶ 234.)

Defendant avers that Plaintiff told her niece, Minutes, about the letter from Defendant's Human Resources Department and that the letter stated that Plaintiff was still an active employee and needed to contact Defendant.  (Doc. 22 ¶ 114.)   Plaintiff denies this.  (Doc. 30 ¶ 114.)   Defendant avers that Minutes advised Plaintiff to call Defendant's corporate office, but Plaintiff told Minutes she was not going to do so.  (Doc. 22 ¶ 114.)

Plaintiff testified that she believed the EEOC was handling the matter but no one at the EEOC had instructed her not to contact Defendant.  (Doc. 22 ¶¶ 115-16; Doc. 30 ¶¶ 115-16.)   She further testified that she would have contacted Defendant but what Ulrich did was illegal.  (Doc. 32-3 at 27-28 (Pl. Dep. 108:24-109:2).)

Plaintiff adds that

> if Matthew Spott, Lisa Torrez, or anyone
> else, just said they know what he did was
> wrong, that they were sorry, that they
> admitted they were in possession of her
> doctor's note, she would have contacted them.
> Instead they acted like they never received
> anything, when they did, and were deceptive
> about it, she could not trust them.  She
> decided that the EEOC could handle it at that
> point.

(Doc. 30 ¶ 180.)

Walsh testified that a doctor's note was for a "clearance," to let Defendant know there were no restrictions on the employee returning to work.  (Doc. 30 ¶ 189.)  She also testified that it would be a violation of HIPPA if Defendant were to require a diagnosis.  (Doc. 30 ¶ 192.)

In September 2013, Plaintiff received another letter from Human Resources Manager Dawn Johnson which was prompted by Ulrich's attempt to submit a termination form for Plaintiff in connection with cleaning up the e-time program, the system employees use to clock in and clock out.  (Doc. 22 ¶¶ 118-19, 129; Doc. 30 ¶¶ 118-19, 129.)  Plaintiff adds that the averments are denied insofar as they imply that she was not previously informed that she was terminated.  (Doc. 30 ¶¶ 118-19.)  Johnson's letter dated September 12, 2013, reviewed Torrez' attempts to contact Plaintiff and Torrez' directives to Plaintiff, Plaintiff's failure to contact Torrez as requested, and the fact that Defendant's records indicated an active employment record with a last day worked as

17

February 20, 2013.  (Doc. 22 ¶¶ 129-31; Doc. 30 ¶¶ 129-31.)  The letter also included a request for Plaintiff to call Johnson by September 20, 2013, to discuss Plaintiff's ability and intention to return to work, and a directive that, if she failed to do so, an administrative termination would be effective September 21, 2013. (Doc. 22 ¶¶ 132-33; Doc. 30 ¶¶ 132-33.)  At the time Johnson sent the letter, it was her understanding that Plaintiff had not submitted a return to work note (Doc. 22 ¶ 134); Plaintiff acknowledges only that this was Johnson's testimony (Doc. 30 ¶ 134).  Plaintiff testified that she read and understood the letter. (Doc. 22 ¶ 135; Doc. 30 ¶ 135.)  Defendant avers she took no action in response to the letter (Doc. 22 ¶ 136); Plaintiff states she took no action because she had a complaint pending with the EEOC (Doc. 30 ¶ 136).  Johnson submitted Plaintiff's termination paperwork on September 21, 2013, identifying the reason for termination as "job abandonment."  (Doc. 22 ¶ 137; Doc. 30 ¶ 137.) Defendant avers that Plaintiff's effective termination date was September 21, 2013, and was based on Plaintiff's failure to contact Johnson in response to Johnson's letter.  (Doc. 22 ¶ 138.) Plaintiff asserts that this is a conclusion of law to which no response is required.  (Doc. 30 ¶ 138.)  Plaintiff avers Johnson testified she was led to believe that the termination form contained a termination date of March 2013.  (Doc. 30 ¶ 242.)

Plaintiff's counter-statement of facts identifies two

individuals previously employed by Defendant, Chance Rowe and his sister Ashley Colon, who had medical problems and were terminated. (Doc. 30 ¶¶ 243-48.)  Rowe testified that he suspected that the terminations were related to the medical problems.  (Doc. 30 ¶¶ 247, 248.)

Plaintiff's Complaint alleges that Defendant perceived her as having a disability.  (Doc. 22 ¶ 139; Doc. 30 ¶ 139.)  Plaintiff testified she does not know what disability she was perceived as having and no one at Stericycle said that Plaintiff had a disability.  (Doc. 22 ¶¶ 141-43; Doc. 30 ¶¶ 141-43.)  Plaintiff also testified that the basis of her lawsuit is her belief that Defendant prevented her from returning to work.  (Doc. 22 ¶ 151; Doc. 30 ¶ 151.)

Defendant avers that other than complaining about being passed over for a full-time position, Plaintiff testified that she never made any complaints related to her employment with Stericycle and never called the Team Member Help Line.  (Doc. 22 ¶ 153.) Plaintiff adds that before her surgery Matthew Spott said he was going to offer her a full-time position but it fell through.  (Doc. 30 ¶ 155.)  She testified at her deposition that she thought Spott may have tried to get rid of her after she went over his head. (*Id.*)  Plaintiff denies that she never complained--she specifically complained to Defendant and the EEOC about being discriminated against.  (Doc. 30 ¶ 153.)

As noted above, Plaintiff filed her Complaint on December 13, 2013.  (Doc. 1.)  The one-count Complaint alleges that Defendant violated the Americans with Disabilities Act ("ADA") and ADA Amendments Act of 2008 ("ADAAA"), "by regarding her as having a disability (i.e., perceived impairment) and refusing her return to employment, and/or terminating her from employment, and/or constructively discharging her from employment."  (Doc. 1 ¶ 8.)

## II. Discussion

### A.   *Summary Judgment Standard*

Summary judgment is appropriate when the movant demonstrates there is no "genuine issue as to any material fact."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248).  In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public*

*Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted).

The initial burden is on the moving party to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id.* at 325. The non-moving party may not rest on the bare allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Id.* at 324.

Where underlying facts are in dispute, the facts are viewed in the light most favorable to the plaintiff. *Abramson v. William Patterson College of N.J.*, 260 F.3d 265, 267 (3d Cir. 2001) (citing *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 854 N.1 (3d Cir. 1990). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

**B. ADA Legal Framework**

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to claims under the ADA. *See Shaner v. Synthes (USA)*, 204 F.3d 494, 500 (3d Cir. 2000) (citations omitted); *see also Reilly v. Lehigh Valley Hospital*, 519 F. App'x 759, 762 (3d Cir. 2013) (not precedential). First, the court considers whether the plaintiff can establish a *prima facie* case. To make out a *prima facie* case of disability discrimination under the ADA, a plaintiff must establish that she: "(1) has a 'disability' or is regarded as having a 'disability'; (2) is otherwise qualified to perform the essential functions of the job; and (3) has suffered an adverse employment action because of [her] disability." 519 F. App'x at 762. Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 762-63 (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant satisfies this burden, the plaintiff is afforded an opportunity to show that the defendant's stated reason was pretext. *Id.* at 763 (citing *McDonnell Douglas*, 411 U.S. at 804).

The "ADAAA" states that an individual is "regarded as" disabled if she establishes that she "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the

impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  The "regarded as" analysis "focuses not on [the plaintiff] and his actual abilities, but rather on the reactions and perceptions of the persons interacting or working with him."  *Kelly v. Drexel University*, 94 F.3d 102, 108-09 (3d Cir. 1996).

## C. Prima Facie Case

Here Plaintiff proceeds under the "regarded as" prong of the ADA.  Defendant presents several arguments in support of its assertion that no evidence shows that Plaintiff can proceed under this prong.  We will address each in turn.

## 1.   Plaintiff's Condition was Transitory and Minor

Defendant first argues that Plaintiff cannot satisfy the first prong of her *prima facie* case in that she is not covered by the ADA because her condition was both transitory and minor: Plaintiff's release to return to work two weeks after surgery is evidence that her condition was minor and of limited duration.  (Doc. 24 at 10-12.)  We agree.

The statutory provision defining disability "curtails an individual's ability to state a 'regarded as' claim if the impairment is 'transitory and minor,' which means it has an 'actual or expected duration of six months or less.'"  *Budhun v. Reading Hosp. and Medical Center*, 765 F.3d 245, 259 (3d Cir. 2014) (citing 42 U.S.C. § 12102(3)(B)).  This is an objective determination,

"[t]hat is to say the relevant inquiry is whether the impairment that the employer perceived is an impairment that is objectively transitory and minor." *Id.* (citing 29 C.F.R. § 1630.15(f)). The regulations list being "transitory and minor" as a defense to an ADA claim. *Id.*

Plaintiff presents several arguments in response to Defendant's assertion that Plaintiff's condition was both transitory and minor, first asserting that Defendant regarded Plaintiff "as having more than a 'transitory and minor' impairment because it specifically refused to allow Plaintiff to return to work unless she disclosed her exact medical condition." (Doc. 31 at 7.)

Here application of the "transitory and minor" provision is not straightforward. In the timeframe before the request for a specific diagnosis (March 7, 2013), the record shows only the following relevant information: Plaintiff submitted a doctor's note on February 6, 2013, that she was going to be off work for surgery scheduled to be done on February 22, 2013 (Doc. 22 ¶¶ 27, 29); on March 2, 2013, (approximately) Plaintiff called Walsh "to come back to work" and during the course of the conversation "Walsh told her to wait the two weeks she was given for time off" and "Plaintiff told Walsh the date of her follow-up appointment with her doctor" (Doc. 30 ¶ 162); Defendant only learned the specific reason for Plaintiff's absence in the course of this litigation (Doc. 30 ¶

24

26). From this evidence we know that Defendant knew Plaintiff had surgery from which she reportedly would be sufficiently recovered in two weeks to return to work and Defendant knew no other details about the absence.[4] Based on this limited information we do not find support for Plaintiff's position that Defendant perceived Plaintiff to have an impairment that would last more than six months. 42 U.S.C. § 12102(3)(B). As we will later discuss in greater detail, our circuit court has approved the principle that requiring a medical release before allowing an employee to return to work following surgery is a "prudent requirement." *Parker v. Port Authority of Allegheny County*, 90 F. App'x 600, 604 (3d Cir. 2004) (not precedential) (citing *Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001)). Nothing in the record allows us to infer more in this case, particularly in that Defendant corrected its initial error of requiring specific medical information in the return-to-work note.

Plaintiff next argues that, although Defendant did not know the nature of her surgery, the removal of her gallbladder "is permanent, as she cannot have it put back into her body. Thus, any

---

[4] Although elsewhere in her brief Plaintiff infers that Walsh only knew of the duration of Plaintiff's absence because of the March 6, 2013, medical release (Doc. 31 at 13), it can reasonably be inferred that Walsh learned of Plaintiff's proposed/tentative return to work date through Plaintiff's March 2, 2013, call which included information that Plaintiff was ready to return to work and the date for her scheduled follow-up doctor's appointment (*see* Doc. 30 ¶ 162).

reference to a transitory or minor impairment is not applicable."
(Doc. 31 at 7-8.)  This argument is without merit in that "the
impairment that the employer perceived," *Budhun*, 765 F.3d at 259,
was surgery with a reported clearance to return to work two weeks
post-surgery.  *See supra* n.3.  The permanence of the removal of her
gallbladder and the *potential* side effects of such surgery are not
at issue.

Finally, Plaintiff asserts that Defendant waived the
"transitory and minor" defense because it was not asserted as an
affirmative defense.  (Doc. 31 at 8.)  Defendant responds that the
facts giving rise to the defense were not known until discovery was
conducted and it is properly asserted in the pending motion.  (Doc.
35 at 7 n.5.)

Under Rule 8(c) of the Federal Rules of Civil Procedure, an
affirmative defense should be asserted at the appropriate
responsive pleading.  *Eddy v. Virgin Islands Water and Power
Authority*, 256 F.3d 204, 209 (3d Cir. 2001). "But under established
circuit law, the failure to do so does not automatically result in
waiver."  *Id.* (citing *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d
Cir. 1991)). "'[A] defendant does not waive an affirmative defense
if [h]e raised the issue at a pragmatically sufficient time, and
[the plaintiff] was not prejudiced in its ability to respond.'"
*Id.* (quoting *Charpentier*, 937 F.2d at 864).  "'[A] motion for
summary judgment is not the most appropriate way to raise a

26

previously unpled defense'" *Id.* (quoting *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1373 (3d Cir. 1993)).  However, "in cases in which the plaintiff was not prejudiced, we have held that there was no waiver."  *Id.* (citing *Kleinknecht*, 989 F.2d at 1374; *Charpentier*, 937 F.2d 863-64).

Here Plaintiff does not argue prejudice, nor do we find that Plaintiff has been prejudiced by Defendant raising the transitory and minor defense in the context of its summary judgment motion. The parties agree that Defendant only became aware that Plaintiff's surgery was for the removal of her gallbladder during the course of this litigation, and, as Defendant notes, it became clear during discovery that Defendant's only knowledge of Plaintiff's condition was that she needed to be out of work for two weeks for surgery. Thus, Defendant's summary judgment motion is a "pragmatically sufficient time" to raise the transitory and minor defense.

## 2. Evidence Supporting Application of Regarded-As Prong

Defendant next argues that no evidence suggests that it regarded Plaintiff as having an ADA-covered impairment.  (Doc. 24 at 12.)  Plaintiff responds that Defendant did regard Plaintiff as having an ADA-covered impairment, arguing that "[t]he evidence that logically infers that the Defendant perceived Plaintiff's unknown condition as significantly restricting her work . . . is that it flat out refused to permit her to return to work without disclosing her exact medical condition despite its admitted knowledge that she

27

was released to work without any medical restrictions." (Doc. 31 at 10-11 (citing SOF #154-248).)

Plaintiff's reference to a "flat out" refusal is apparently based on Plaintiff's email from Ulrich and her conversations with him and Walsh. However, this evidence cannot be viewed in isolation. A significant flaw in Plaintiff's argument is that the email from Ulrich and conversations requesting the exact nature of Plaintiff's condition were quickly corrected: through communication from Spott and Torrez, Defendant clarified within days of Ulrich's email and phone calls that detailed information about Plaintiff's condition was not needed. Thus, though we draw reasonable inferences in Plaintiff's favor, Plaintiff asks us to draw inferences that are not reasonable. Furthermore, our circuit court has noted that an employer's request for a medical excuse for an employee's absence does not indicate that the employer regarded the employee as disabled. *Parker*, 90 F. App'x at 604 (citing *Somers*, 245 F.3d at 788). As noted previously, *Somers* stated that requiring a medical release before allowing an employee to return to work following surgery is a "prudent requirement." 245 F.3d at 788. Here, there is no argument that Defendant initially erred in requiring too much information from Plaintiff, but that error does not support an inference that Defendant regarded Plaintiff as having an ADA-covered disability, particularly where Defendant attempted to correct the error within a short period of time.

Similarly, Plaintiff's claim that Defendant knew she had been released to return to work with no restrictions, if true, would not support her "regarded as" argument: at most it may show an error in judgment in requesting Plaintiff to resubmit information but, given Plaintiff's refusal to communicate with Spott and Torrez, any further inference would be improper.

Based on the preceding discussion, we do not find that Plaintiff has satisfied the first prong of her *prima facie* case in that she has not shown that her condition was not transitory and minor nor has she presented sufficient evidence to support a conclusion that Defendant regarded her as disabled.  However, in an abundance of caution, we will proceed to the third prong of Plaintiff's *prima facie* case--whether Plaintiff has suffered an adverse employment action because of her disability.  519 F. App'x at 762.

**3.   Adverse Employment Action**

Defendant also argues that Plaintiff cannot satisfy the third prong of the *prima facie* case in that she cannot show she suffered an adverse employment action because of a perceived impairment: whatever mistakes Ulrich made, it remains undisputed that Spott took prompt steps to inform Plaintiff she did not need to provide the exact medical reason for her absence.  (Doc. 24 at 14.) Plaintiff maintains she was terminated because of a perceived disability, specifically stating that it is not accurate that

"Spott promptly took steps to clarify and inform the Plaintiff that she did not need to know the details of her medical condition." (Doc. 31 at 12-14.)  We conclude that Plaintiff has not met her burden on this issue.

In support the assertion that she was fired, Plaintiff states that she sent an email to Spott on March 13, 2013, asking if she had been fired twice and neither "Spott, nor any other Stericycle employee, ever responded to the Plaintiff to tell her that she was not fired." (Doc. 31 at 13.)  This averment is contradicted by the record: although no Stericycle respresentative specifically used the words "you are not fired," communication with Plaintiff made it abundantly clear that she had not been terminated.  In a March 12, 2013, email to Plaintiff, Spott requested that Plaintiff contact him *about her return to work* (*see* Doc. 2 at 5).  The email states in full:

> Good morning Sharon,
>
> The supervisors and myself have made numerous attempts to contact you via phone, and I will continue that process today.  I need you to contact me no later than Wednesday March 13, 2013, by 3pmET.  Your employment with the company depends on this.  In order for you to return to work we need the following information on a doctor's note:
>
> > When you became ineligible and incapable of coming to work
> >
> > When you are able to return to work
> >
> > When you return to work, what restrictions you may have (in case

accommodation is necessary)

> We do not need to know the details of your
> condition, only the information that is
> listed above is required.
>
> Sincerely,
>
> Matthew

(Doc. 2 at 5.)  Although Spott says that Defendant will need a

doctor's note for Plaintiff to return to work, he does not say that

Plaintiff's employment depends on submitting another doctor's note

by 3:00 p.m. the next day; simply *contacting him* is the request

linked to her continued employemt.  Thus, to the extent Plaintiff

believed before she received the email that she had been fired for

not submitting a note with detailed medical information, Spott's

email makes clear that she had not been fired for any reason and

the key to her continued employment was contacting her employer.

In correspondence dated March 15, 2013, Torrez stated the

following:

> I have called and left messages for you on
> March 14, 2013 and March 15, 2013 in an
> attempt to discuss your leave.  I have not
> received a return call from you nor has
> Matthew Spott the Human Resources Generalist
> in the Dunmore location.  I was hoping to
> discuss the release to return to work with no
> restrictions from your physician which we
> need for our files in order to be able to
> create your work schedule and return to work.
>
> At this time you are an active Team Member
> Communications Solutions, an operating
> business segment of Stericycle, Inc.
>
> Please be advised you will have until Friday,

31

> March 22, 2013 to submit a return to work
> note from your physician.  However, if you
> feel you will not be able to meet that
> timeline, you need to contact me directly by
> Monday, March 18, 2013.
>
> Feel free to contact me if you have any
> questions.

(Doc. 2 at 10.)  This correspondence shows that to the extent
Plaintiff believed before she received the letter from Torrez that
she had been fired for not contacting Spott by March 13th, Torrez'
letter made clear that she had not been fired for any reason and,
once again, the key to her continued employment was contacting her
employer (in that the timeline for submitting the note is presented
as flexible *upon direct contact* with Torrez).  While it may be
appropriate for Plaintiff to believe she had been terminated after
she did not contact Torrez on March 18th, did not submit the
physician's note on March 22nd, and did not call Torrez with any
questions, the termination would have been for failure to follow
specific directives--not because Defendant regarded Plaintiff as
disabled in violation of the ADA.[5]

Furthermore, if Spott or Torrez had seen or were aware of the
previously submitted note (although no evidence supports such an
assumption), the request for Plaintiff to resubmit it does not
equate with an adverse employment action supporting an ADA

_____

[5] Though the exact date of termination is not dispositive,
evidence of record indicates that Plaintiff was not officially
terminated until September 2013.  (*See* Doc. 22 ¶¶ 118-138.)

32

violation.  As Defendant argues, the undisputed facts are that
several members of Defndant's HR team reached out to Plaintiff
about her return to work, she made a conscious decision to ignore
them, and made no attempts to remedy any apparent confusion despite
being given multiple opportunities to do so.  (*See* Doc. 35 at 10.)
In this context, any mistake made on Defendant's part in the
handling of Plaintiff's return to work cannot reasonably be
construed as a violation of the ADA.[6]

The record shows that Plaintiff unilaterally decided she had
been fired following her communication with Ulrich and thereafter.
It is noteworthy that Plaintiff testified that when she asked Walsh
in a March 7, 2013, phone call whether she was fired, Walsh
responded that it was up to Human Resources.  (Doc. 22 ¶ 58; Doc.
30 ¶ 58.)  Yet, Plaintiff ignored assurances from HR
representatives that she had not been terminated.  She refused to
contact them to discuss her return to work, ostensibly because she

---

[6]  Walsh testified that for an employer to ask for a diagnosis
to be included in a return-to-work slip would be a HIPAA violation.
(Doc. 32-4 (Walsh Dep. 14:9-12).)  "Neither the U.S. Supreme Court
nor the United States Court of Appeals for the Third Circuit
has specifically addressed the issue, however, other district courts,
including the Middle District, have all found that HIPAA does not
create a private right of action."  *Duganne v. Giroux*, Civil
Action No. 3:13-1359, 2014 WL 4626692, at *7 (M.D. Pa. Sept. 15,
2014) (listing cases).  In *Polanco v. Omnicell, Inc.*, 988 F. Supp.
2d 451, 469 (D.N.J. 2013), the court noted that "[t]he ability to
bring a enforcement action to remedy HIPAA violations . . . lies
within the exclusive province of the Secretary of Heatlh and Human
Services.'" (citing *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir.
2006)).

believed Spott to be deceptive.  (Doc. 32-3 at 28 (Pl. Dep. 109:22-24).)  In defense of her decision not to contact Defendant as requested, Plaintiff also maintains it was her understanding that once she filed with the EEOC, she was "supposed to let them handle it at that time."  (Doc. 32-3 at 27 (Pl. Dep. 108:19-21).)  Plaintiff confirmed that no one from the EEOC told her not to contact Defendant.  (Doc. 32-3 at 27 (Pl. Dep. 108:22-24).)  She added that she

> would have contacted Stericycle or Matt or any of them, but it's--my problem is, we all know what Chris Ulrich did was illegal. You're not supposed to ask that information. We all know that.  If Matt [Spott], Lisa Torrez, anybody would have said, hey, we know Chris did something wrong, we're sorry, we got our doctor's excuse, anything, I would have contacted them.  But for them to sit there and act like they never received anything and more or less being very deceptive because they're not being honest in it, how can I trust them to call them.  Let the EEOC handle it at that point.

(Doc. 32-3 at 27-28 (Pl. Dep. 108:24-109:12).)  Plaintiff then confirmed that Spott's email specifically stated Defendant did not need to know the details of her condition.  (Doc. 32-3 at 28 (Pl. Dep. 109:16-19).)  When asked if it mattered at that point that Ulrich had previously asked for details, Plaintiff responded: "What matters is that Matt [Spott] in here, to me, is being very deceptive because he's still not acknowledging that they had my medical excuse.  I handed it in.  They received it.  And he's more or less, to me, covering up what Chris did."  (Doc. 32-3 at 28 (Pl.

34

Dep. 109:20-110:2).)

Plaintiff's acknowledgment that she "*would have* contacted" Defendant if she had received what she considered an appropriate apology shows that she did not believe that *only* the EEOC could handle her employment issue.[7]  Her position is essentially that despite representations that she had not been terminated and that details of her medical condition were not required, Defendant's initial error of improperly asking for detailed medical information (which was corrected) is sufficient to establish a violation of the Americans with Disabilities Act.  This is not the law.

Plaintiff's unsubstantiated perception that she was fired is clearly not enough to meet her burden.  Any conflicting testimony about who knew, did and/or said what when does not create a genuine issue of material fact because the discrepancies relate to the time period before Defendant's Human Resources personnel became involved.  The documentation of the steps taken by HR personnel to clarify Plaintiff's employment situation are matters of record uncontradicted by competent evidence.  The previously reviewed evidence shows that Plaintiff was not fired because Defendant regarded her as disabled; no competent evidence contradicts

---

[7] We note that Plaintiff acknowledged she read Defendant's Handbook and understood the policy contained therein which provided that an employee would go to a manager then Human Resources with her concern if she was not satisfied with her supervisor's handling of the problem.  (Doc. 22 ¶¶ 10, 11; Doc. 30 ¶¶ 10, 11.)  The record shows that Plaintiff neither followed this policy nor contacted the Team Member Help Line.

Defendant's position that Plaintiff was eventually terminated because she abandoned her position.[8]

Because we have concluded that Plaintiff cannot satisfy either the first or third prong of her *prima facie* case, summary judgment in Defendant's favor is appropriate.  However, again in an abundance of caution, we will review the parties' arguments on the issue of pretext.

## D. Pretext for Discrimination

Finally, Defendant argues that Plaintiff lacks any evidence showing that its legitimate and non-discriminatory actions were pretext for unlawful discrimination.  (Doc. 24 at 20.)  For reasons similar to those discussed above, we conclude Plaintiff has not produced evidence from which a reasonable factfinder could conclude Defendant's proffered reasons for termination were a pretext for discrimination.

If we were to assume *arguendo* that Plaintiff could satisfy her initial burden of establishing a *prima facie* case, the burden of production would shift to Defendant to articulate a legitimate nondiscriminatory reason for its action.  *McDonnell Douglas*, 411 U.S. at 802.  Once an employer meets the "relatively light" burden

---

[8]  Plaintiff's reference to Defendant's alleged further error of asking for a medical release which she had already sent does nothing to further her claim, particularly in light of the undisputed fact that she did not speak with either Spott or Torrez about having previously sent a medical release and never called them despite several requests to do so.

of production coming forward with a legitimate nondiscriminatory reason for its action, the burden shifts to the plaintiff to demonstrate pretext by a preponderance of the evidence. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Here Defendant has met its burden, asserting it terminated Plaintiff after she refused to communicate with Defendant's HR representatives and effectively abandoned her position. (*See*, *e.g.*, Doc. 24 at 7, 20.) Thus, we turn to whether Plaintiff has produced evidence of pretext.

> To demonstrate pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication," or (2) present evidence sufficient to support an inference that "discrimination was more likely than not a . . . determinative cause of the adverse employment action." *Fuentes v. Perske*, 32 F.3d 759, 762 (3d Cir. 1994). To meet that burden, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." *Id.* at 765. The fact that an employer made a poor or unwise decision does not make that decision discriminatory. *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason."). Evidence undermining an employer's proffered legitimate reasons therefore must be sufficient to "support an inference that the employer did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). A non-moving plaintiff can meet that burden at the summary judgment stage by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

> employer's proffered legitimate reasons for
> its action that a reasonable factfinder could
> rationally find them 'unworthy of credence,'"
> and thus infer that nondiscriminatory reasons
> were not the cause for the adverse employment
> action.  *Fuentes*, 32 F.3d at 765.

*Ball v. Einstein Community Health Associates, Inc.*, 514 F. App'x 196, 199-200 (3d Cir. 2013) (not precedential).

Defendant points to its ongoing attempts to communicate with Plaintiff and Plaintiff's own admissions that she took no action in response to these attempts in support of its argument that Plaintiff cannot show pretext. (Doc. 24 at 20.)  Plaintiff responds that she did not unreasonably neglect to respond to Defendant; she avers she was being deceived by Defendant's employees and no longer trusted any representations made by them. (Doc. 31 at 14.)  Plaintiff adds that she was told "she would not be allowed to return to work if she did not do something that she knew was unlawful, i.e., disclose her medical condition.  She was led to believe she was fired if she did not disclose it."  (Doc. 31 at 14.)  Importantly, with this argument Plaintiff does not discuss Defendant's assurances to the contrary and her failure to communicate with Defendant despite its multiple requests that she do so.  Other than her general perception that she was being deceived, Plaintiff offers absolutely no evidence that the assertions made by Spott and Torrez regarding her continued employment were inaccurate.  By her own admission, Plaintiff was told that detailed medical information was not needed and she did

nothing to clarify any confusion she may have had regarding the medical release required and the doctor's note she faxed to Defendant on March 6, 2013.  As discussed in the context of her *prima facie* case, here the record does not support Plaintiff's attempt to undermine Defendant's proffered reason for termination with her reliance on Defendant's initial improper request for detailed medical information and her distrust of the motives of Defendant's HR representatives.

Plaintiff also attempts to demonstrate pretext through the testimony of Chanse Rowe, a former Stericycle employee.  (Doc. 31 at 15.)  Rowe "suspected that his medical condition was the cause of his suspension and termination," and also testified that his sister who had medical problems had been terminated.  (*Id.*)  Rowe testified that Spott had refused medical notes from himself and his sister.  (*Id.*)  Plaintiff points to Rowe's testimony in support of an alleged pattern: "Stericycle wanted to know medical conditions for its employees."  (*Id.*)

Defendant responds that "Rowe's testimony falls far short of demonstrating any pretext": having missed work for medical reasons, Rowe returned to work after submitting a doctor's note; Rowe admitted in his deposition that Defendant suspended him pending investigation when Rowe made sexual jokes over the call center's headsets and Defendant had recorded them; Defendant informed Rowe that he violated the harassment policy and he subsequently received

a termination letter after his suspension.  (Doc. 35 at 13-14.)  We agree with Defendant that "[m]ere speculation about Stericycle's motives by a former employee . . . is woefully insufficient for Plaintiff to establish pretext."  (Doc. 35 at 14.)  Though Rowe testified he does not know specifically why he was terminated (the termination letter did not mention anything about a policy (Doc. 32-10 (Rowe Dep. 22:15-17))), his testimony cannot be construed as anything more than speculation.  Similarly, any reliance on Rowe's testimony about his sister's experience is misplaced in that Rowe testified that he did not know the circumstances of his sister's employment and termination.  (Doc. 35 at 14 n.10; Doc. 32-10 (Rowe Dep. 18:11-19:21).)

This review of Plaintiff's proffered evidence is not sufficient to cast such doubt on Defendant's proffered reason that a factfinder could reasonably conclude that the reason was a fabrication, nor is the evidence sufficient to support an inference that "discrimination was more likely than not a . . . determinative cause of the adverse employment action."  *Fuentes*, 32 F.3d at 762. Plaintiff's proffered evidence cannot support an inference that Defendant did not act for its stated reasons.  *Sempier*, 45 F.3d at 731.  Plaintiff has not demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

40

'unworthy of credence,'" and thus infer that nondiscriminatory reasons were not the cause for the adverse employment action. *Fuentes*, 32 F.3d at 765.  Even assuming *arguendo* that Plaintiff were able to satisfy her *prima facies* case, Plaintiff has not satisfied her burden of showing pretext.  Therefore, Defendant is entitled to judgment in its favor.

### III. Conclusion

For the reasons discussed above, we conclude that Defendant's Motion for Summary Judgment (Doc. 21) is properly granted.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: January 28, 2015

41